## McDowell *versus* Oyer.

21　　417
30 SC ⁵131

1. In an action of *assumpsit*, the common counts for work and labor, money paid, &c., may be joined with a special count in which damages are demanded for the non-conveyance of a piece of land in pursuance of a parol contract, in consideration of service rendered by the plaintiff.

2. To such a declaration the plea of *not guilty* is inapplicable.

3. This Court will not reverse on account of an allegation by the Court in the charge as to the extent to which the claim of the plaintiff was denied, the evidence on the subject being contradictory or not in harmony, and having been submitted to the jury. The jurisdiction of this Court extends to the correction of only legal errors.

4. Where no points have been submitted, the statement by the Court of the counsel's course of argument, must be taken as true, it being the only evidence on the subject which the record affords.

5. In an action of *assumpsit* to recover damages for a neglect or refusal to convey a piece of land in consideration of the plaintiff's services rendered in pursuance of a parol or verbal contract, it was *Held*, that the plaintiff may recover *the value of the land* which the other contracting party had promised to convey.

6. The verdict may exceed the value of the land by proof of misconduct in the vendor, (as where he might have made title but did not) or of special injury to the vendee resulting from the failure to convey.

7. Our statute of frauds does not prohibit a recovery of damages in such an action.

8. As to the doctrine or principle of *stare decisis*, see the opinion in this case.

ERROR to the Common Pleas of *Franklin county*.

This was an action on the case on promises, brought to October Term, 1851, by Jacob Oyer v. John M. McDowell, administrator of the estate of Jacob Myers, deceased.

The declaration contained a special count, in which it was alleged

that, in the year 1847, in consideration that the plaintiff would not remove to the west, but would remain in the county of Franklin, and farm the place of Jacob Myers, and attend to his business generally, as long as Myers should live, that Myers undertook and· promised the plaintiff that Myers would give him a tract of land, situate in Montgomery township, in said county adjoining lands, &c., and a small lot *which the said Myers had before that time given to the plaintiff* and of which the plaintiff was in possession, containing about fifteen acres, and would make him a deed for both of said tracts of land, as well the one of which the said plaintiff was possessed as of the tract he then and there promised to give him.

It was further alleged that Myers promised to build for the plaintiff an addition to the house which was erected on the piece of land of which the plaintiff was in possession, and dig a well for him, and pay for these improvements. It was alleged that the plaintiff remained and farmed the place, &c., till the death of Myers, a period of about three years and a half. It was averred that the land had not been conveyed, nor an addition to the house built; nor the well dug and the improvements paid for; to the damage of the plaintiff $2000.

The declaration also contained counts for goods sold and delivered, work done, &c., concluding to the damage of the plaintiff to the same amount.

A bill of particulars and statement of the cause of action was furnished, in which it was stated that the plaintiff sought to reco· ver the book accounts sworn to, and also a balance due on a settlement between the plaintiff and Myers, which appears on Myers' books, and which was made in April, 1850. Also for services in managing and conducting Myers' business for three years and a half before his death, under the following circumstances: The plaintiff, some time in 1847, was about to remove to the west. Myers insisted on his staying in Franklin county, and farming his place, and attending to his business generally, and told him that *he, the plaintiff, held the small house he lived in, the title he had already and, the possession;* and that he would give him some twelve or fifteen acres adjoining the house and lot he had already given him, and that he would make him a deed for the whole; that he would build an addition to the house, and dig a well, and pay for these improvements, if the said Oyer would stay, &c. An account was stated for work done, &c., and for money paid, stating a balance of above $50.

The plea was *Not guilty.* In the counter statement it was alleged that the defendant refused to put in any other plea.

No point was submitted on part of the *defendant.*

[McDowell *v.* Oyer.]

KIMMELL, President Judge, *inter alia*, charged, viz.:

"If you are satisfied, from the evidence, that the intestate, in his lifetime, made a parol agreement with Oyer that if Oyer would not remove to the west, but remain in Franklin county, and attend to intestate's business during his lifetime, that he would give him the Wyand house, with a certain number of acres attached thereto —that Oyer remained and fulfilled his part of the contract, and that intestate made no provision before his death to secure the property to Oyer, then you ought to allow Oyer the value of the land as a compensation for his services; .that being the price fixed upon by the parties as the value of the services rendered.

"That there was such a contract is but faintly denied by defendant, but he contends that if there was such an agreement as is alleged here, that the house called the Wyand property, with the ground enclosed, about half an acre, was all that was spoken of by intestate. The evidence on this point is somewhat contradictory. Some of the witnesses speak of the Wyand house without mentioning any number of acres; others of six acres and some perches, whilst others, again, say that the intestate spoke of fourteen or more acres.

"You will determine, from the evidence, how many acres were contracted to be given by the intestate to Oyer, and the value thereof, and that amount, together with so much of the book account as you shall find due and unpaid, will be your verdict.

"Something has been said of a settlement between the intestate and the plaintiff. If there is any evidence to satisfy you that the plaintiff's claim has been settled for and paid, then he cannot recover."

Verdict was rendered for the plaintiff for $1165. The amount was subsequently reduced to $1000, and judgment was entered for that amount.

It was assigned for error: 1. That the Court erred in admitting in evidence the plaintiff's book account. 2d. In instructing the jury "that there was such a contract is faintly denied by the defendant." 3d. In saying to the jury: "You will determine from the evidence how many acres were contracted to be given by the intestate to Oyer, and the value thereof, and that amount, together with so much of the book account as you shall find due and unpaid, will be your verdict."

*McLellan* and *Cornyn*, for plaintiff in error.

It was said that the action being trespass on the case for the non-performance of the parol contract in question, and sounding in damages, the general issue was not guilty, denying the wrongful acts or omissions alleged in the declaration: *Stevens on Pleading*

[McDowell *v.* Oyer.]

159–160; 1 *Chitty* 147–8; 1 *Saund.* 131. That this plea did not put the book account in issue. That the causes of action in this case could not be joined, reference was made to 5 *Harris* 495.

As to the *second* assignment, it was observed that the instruction was calculated to mislead the jury.

3. It was alleged that, under the contract in dispute, the land could not have been recovered as possession was not taken in pursuance of the contract, the boundaries not marked, and the evidence as to the contract *uncertain* as to the quantity of land. That to enable the party to recover *the value of the land*, would be equivalent to a recovery of *the land itself.* The value of the land should not be recovered without regard to the amount of labor performed. It was contended that the measure of damages in a case of this character, should be a fair and reasonable compensation for the labor actually performed.

On the part of the plaintiff in the suit, reliance was placed on the *declarations of the party.* This, it was alleged, was a dangerous species of testimony on account of the facility with which it may be fabricated, and the difficulty of contradicting it, and its liability to mistake. It was alleged that the value of the service rendered should be the rule. It was said that the weight of decision was against considering *the value of the land* as the measure of damages: 17 *Maine Rep.* 296; 9 *New Hamp.* 298; 5 *Id.* 133; 1 *Fairf.* 81; 1 *Vermont* 69; 1 *Binn.* 454; Ewing *v.* Tees, 8 *Barr* 197; Hastings *v.* Eckley's Administrators, opinion of WOODWARD, J., in the Common Pleas. In Jack *v.* McKee, 9 *Barr* 239, the contract was to give a specified farm containing an ascertained quantity of land (100 acres). It was alleged that, in the present case, the evidence as to the quantity of land was of an uncertain character. The *Troutman property*, referred to by some of the witnesses, contained *six acres and some perches.* The property occupied by Wyand, which was spoken of by other witnesses as the property meant, contained *one or two acres* testified to be worth $150 or $200. Other witnesses testified to a declaration as to *fourteen* acres.

*Reilly*, for defendant.—It was alleged that the declaration being in trespass on the case *upon promises*, the plea of *not guilty* was a nullity and denied none of the allegations in the declaration.

This was not an action to recover damages for the non-performance of a parol contract, *for the purchase of land;* but *on a contract for services to be paid for in land,* and was *brought to recover the value of such services on a breach of that contract.* In Jack *v.* McKee, 9 *Barr*, the same kind of action was brought, the same kind of declaration filed, and there was the same joinder of counts. So in Bash *v.* Bash, *Id.* 260. In the case of Gangwer

[McDowell *v.* Oyer.]

*v.* Fry, 5 *Harris* 495, it is not decided that in an action to recover compensation for services, and also to recover for work done and money paid, as in this case, an account for work done and money paid cannot be admitted in evidence.

3. The statute of frauds applies only to a parol contract for the sale of land. This was an action on a contract for services to be paid for in land. In Jack *v.* McKee, 9 *Barr* 235, it was decided that such a contract was not within the statute of frauds. That the value of the land was the measure of damages, reference was made to Kelly *v.* Foster, 2 *Bin.* 6–7; Rohr *v.* Kindt, 3 *W. & Ser.* 563; Jack *v.* McKee, 9 *Barr*; and Bash *v.* Bash, *Id.* 260.

The opinion of the Court was delivered, July 25, by

BLACK, C. J.—This was *assumpsit.* The plaintiff proved (or produced evidence tending to prove) that there was a contract between him and the defendant's intestate, by which he (the plaintiff) was to serve Myers as his agent and the manager of his business, until his (Myers') death; that for this service Myers was to give him a certain piece of land; that the service was rendered accordingly, but Myers died without conveying the land, and without making any provision for carrying his part of the contract into effect. The plaintiff also had a book account for blacksmith's work.

The declaration contained the common counts, and a special count averring the contract above mentioned, performance by the plaintiff, and a breach by the other party.

The three errors assigned are, (1), that the book account was improperly admitted in evidence; (2), that in the charge the jury were told that the contract was *faintly* denied; and (3), that they were erroneously instructed to regard the value of the land as the measure of damages.

I. All the counts in this declaration are in *assumpsit*. The cause of action on the contract could not have been set out in any other form. It is entirely too late in the day to deny that the common counts for work and labor may be joined with a special count. The plea of not guilty to a declaration in *assumpsit* is barbarous, and if the plaintiff had demurred, the judgment must have been for him. The best we can do for the defendant is to suppose that he has pleaded a proper plea. Assuming thus much in his favor, the admission of the book account was perfectly right.

II. Nine witnesses testify to the declarations of Myers, that Oyer had given up his intention of moving to the west, to stay with him, and attend to his business, in consideration of his promise to give him a piece of land. He did not state the bargain with equal distinctness to all the witnesses, and in some of the

2 N

[McDowell *v.* Oyer.]

conversations he seems to have referred to one tract, and in others to a different one. The judge said that the defendant denied *faintly* the fact of there being such a contract, and contended that if there was any contract at all, it related to the least valuable of the tracts; and on this subject the evidence being contradictory, it was submitted to the jury to say.what land was designated in the contract.

I cannot see how we are expected to treat this as an error fatal to the judgment. If this remark of the Court were demonstrated to be a mistake—if it were proved to our entire satisfaction that the contract was denied not faintly, but loudly—we could not reverse on that account; for it concerns no matter of law, and our jurisdiction does not extend to the correction of any but legal errors. Besides, when there are no written points submitted, the statement by the Court of the counsel's line of argument must be conclusively taken as true, that being the only evidence on the subject which the record affords. In addition to this, we think there was no just ground on which an absolute and total denial of the contract could be safely rested. That there was some contract like the one alleged was very clearly proved. If, therefore, the Court had said that it was not denied at all, it would be but justice to the candor of the defendant and his counsel to believe the statement.

III. The main question in the cause is, whether the right rule was adopted for assessing the damages. The Court charged that the measure of compensation for the plaintiff's service was the value of the land which the other party had promised to give for it.

This case is in every word and circumstance precisely like Jack *v.* McKee (9 *Barr* 235), in which this Court unanimously decided that one who gives his personal services on a contract to be paid in land, is entitled, if he does not get the land, to get its value. The same thing was held in Bash *v.* Bash (9 *Barr* 260). It had been previously established as the law of New York, in Burlingame *v.* Burlingame (7 *Cow.* 92), and a point nearly akin to it was settled here in Rohr *v.* Kindt (3 *W. & Ser.* 568). These decisions did but embody and stamp with the impress of judicial authority the almost universal opinion of the legal profession, and the innate sense of right which pervaded the popular mind. Although such cases must have arisen very often, the two taken up in 1848 from Westmoreland, were the first that reached this Court. To my certain knowledge, the same rule had many times before that been acted on and sustained by the Courts of Common Pleas, and no question made of its correctness, though it stood in the way of being challenged by some of the ablest lawyers in the western part of the state.

[McDowell *v.* Oyer.]

The judgment we are about to give might well be rested on the mere authority of the cases I have cited. When a point has been solemnly ruled by the tribunal of the last resort, after full argu-- ment and with the assent of all the judges, we have the highest evidence which can be produced in favor of the unwritten law.

It is sometimes said that this adherence to precedent is slavish; that it fetters the mind of the judge, and compels him to decide without reference to principle. But let it be remembered that *stare decisis* is itself a principle of great magnitude and importance. It is absolutely necessary to the formation and permanence of any system of jurisprudence. Without it we may fairly be said to have no law; for law is a fixed and established *rule*, not depending in the slightest degree on the caprice of those who may happen to administer it. I take it that the adjudications of this Court, when they are free from absurdity, not mischievous in practice, and consistent with one another, are the law of the land. It is this law which we are bound to execute, and not any " higher law," manufactured for each special occasion out of our own private feelings and opinions. If it be wrong, the government has a department whose duty it is to amend it, and the responsibility is not in any wise thrown upon the judiciary. The inferior tribunals follow our decisions, and the people conform to them because they take it for granted that what we have said once we will say again. There being no superior power to define the law for us as we define it for others, we ought to be a law unto ourselves. If we are not, we are without a standard altogether. The uncertainty of the law— an uncertainty inseparable from the nature of the science—is a great evil at best, and we would aggravate it terribly if we could be blown about by every wind of doctrine, holding for true to-day what we repudiate as false to-morrow.

Of course I am not saying that we must consecrate the mere blunders of those who went before us, and stumble every time we come to the place where they have stumbled. A palpable mistake, violating justice, reason, and law, must be corrected, no matter by whom it may have been made. There are cases in our books which bear such marks of haste and inattention, that they demand reconsideration. There are some which must be disregarded, because they cannot be reconciled with others. There are old decisions of which the authority has become obsolete, by a total alteration in the circumstances of the country and the progress of opinion. *Tempora mutantur.* We change with the change of the times, as necessarily as we move with the motion of the earth. But in ordinary cases, to set up our mere notions above the principles which the country has been acting upon as settled and established, is to make ourselves not the ministers and agents of the law, but the masters of the law and the tyrants of the people.

[McDowell *v.* Oyer.]

The authorities on the question now before us, are not open to any of the objections which would justify us in setting them aside. They belong to no class of cases which we have the *power* to overturn, even if the rule they established did not meet our approbation on original grounds.

But nothing can be clearer than its justice; and no reasoning can be simpler than that which demonstrates every other to be wrong. It is not denied—it never has been—that one who gives his labor in consideration of a promise that he shall be paid in land, may maintain an action on the contract. Neither is it pretended, on the other hand, that he can recover more than the value of his services. But what is their value? No human being but the parties themselves can tell how much of sacrifice it cost the one to render them, nor what sum of comfort, convenience, and profit, they brought to the other. But they, knowing their own business as nobody else could know it, put an equal value upon the land and the services. They measured the latter by the former, and when we ascertain the value of the one we know how much the other was worth according to the stipulation made by those who alone had a right to determine it.

To hold that a man may make a contract to pay for labor at a certain price, whether the price be expressed in acres or in dollars, and afterwards pay for it at a less price if he pleases, is to offer a premium for fraud. It is absolutely necessary to the preservation of common morality, that every bargain should be so enforced that neither party can gain by breaking it, or lose by performing it. The law enlists the selfishness of men on the side of virtue, by making it the interest of all to be honest.

So conscious were the defendant's counsel of the great wrong which would be inflicted by totally striking down the standard furnished by the contract, that they admitted it might be resorted to as *a* measure of the damages, but not as *the* measure. If it be not the exclusive measure, it must be disregarded altogether. If it be but one of many standards, then there is no standard at all, or as good as none. The jury are without a rule when they have their choice between different rules.

It is argued that *because* the statute of frauds declares that no estate in lands shall be created except by writing, and *because* this was a parol contract, *therefore* the jury must not value the plaintiff's labor as it was valued by himself and his employer, but put a price on it different from that which was agreed to. A more perfect *non sequitur* than this would be hard to find. The plaintiff does not propose to create a title to the land. He is not claiming a conveyance, nor seeking to get possession of it. He is simply demanding his wages.

But then it is said, if the value of the land can be recovered on

[McDowell *v.* Oyer.]

parol evidence, it is no better than taking the land itself; the temptation to perjury being all the same. The statute does not regard the amount in controversy, but the nature of the action. If it does not touch the title, no kind of evidence is forbidden. The right to money or personal property worth millions may be established by parol, but land, however worthless, cannot pass without writing.

Again, say the defendant's counsel, the land may be sold on this judgment, the plaintiff may buy it, and thus get a title in defiance of the statute. This argument, like that last noticed, proves too much. It would be equally good against the admission of parol evidence in all cases. Many thousands of men have had judgments rendered against them on contracts not reduced to writing, and large enough in amount to sell their lands, without dreaming that the statute of frauds would be a legal defence. If the plaintiff gets a sheriff's or an administrator's deed for the land, he will not hold it by parol.

If we regard this in the light of a contract for the purchase of land, still the statute of frauds does in no wise forbid the recovery of full compensatory damages. The fourth section of the English statute, which declares that an action shall not be maintained on a parol contract for the sale of real estate, was left out from our transcript of it. Its principle never was adopted here: (4 *Dall.* 152). The omission was not accidental. The legislature could have meant nothing else by it than to leave such contracts upon the footing which they would have had, if the act had never been passed. And so this Court and all the Courts in the Commonwealth have uniformly held, from the case of Ewing *v.* Tees (1 *Binney* 450) to the present time. It is true that the vendor cannot recover the purchase-money in an action on the parol agreement (1 *W. & Ser.* 554), for the very obvious reason that such a recovery would be equivalent to a decree of specific performance against the vendee; and as the vendor is not bound to perform it, neither is the purchaser, because the obligation to perform can only exist when it is mutual. But though it be true that no estate can be acquired by parol, and therefore no specific performance can be enforced by either party, it is equally true, and all the decisions show it, from first to last, that if the vendee sues for damages, he has precisely the same standing in Court that he would have if the contract was in writing. The statute of frauds, therefore, has absolutely nothing to do with the subject.

There being no distinction between a written and a parol contract in an action for the breach of it, and no reason existing why any such distinction should be taken, what is a vendee entitled to recover who has performed his part of the contract against a vendor who refuses without reason to perform his? There can be but one

[McDowell *v.* Oyor.]

answer to this.  He can recover as much as will make him whole; as much as will compensate him for the injury which the other party has committed against him, in refusing to do what he promised.  This can never be determined without reference to the value of the land.  That measure is always the *minimum* standard of damages, and the verdict may be swelled beyond it by proof of misconduct in the vendor, or special injury resulting to the vendee from the loss of the bargain.  There are different ways of getting at the same thing.  When the price is agreed on *in numero*, the land is *primâ facie* taken to be worth as much as the money which was to be given for it.  In an ordinary case, therefore, the vendee is compensated by recovering back so much of the purchase-money as he has paid; or by nominal damages if he has paid nothing.  But he may prove that it rose in value after the contract, or that it was worth more at the time of the contract than he agreed to give (1 *Jones* 127), and if he does so the vendor must respond for the difference.  See Hopkins *v.* Lee (6 *Wheaton* 109).  When the price is not fixed by the parties, as where it is to be paid for in work or in some service which cannot be accurately appreciated, there is no mode of ascertaining how much the vendee has lost, but by looking at the value of the land; and no means of righting his wrong when he has performed his part, but by giving him damages to that amount.  I speak of cases in which the vendor might make a title, and does not.  Where he is not able to comply with his contract, and is guilty of no default nor bad faith, he is not obliged to pay the vendee for the loss of his bargain.

In this case the title to the land was in the vendor, and he might have conveyed it, agreeably to his contract, if he had chosen to do so.  But he kept it, and it has descended to his heirs to enrich them at the expense of a stranger.  The plaintiff bought it by a fair and honest bargain not forbidden by any law, and paid for it with services which the owner accepted as a full equivalent.  We cannot see the shade of a reason for saying that the plain justice which was done below shall be denied here.

Judgment affirmed.

LOWRIE, J., and WOODWARD, J., dissented.