[J-44-2020] [MO: Baer, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


COMMONWEALTH OF PENNSYLVANIA,

    Appellant

    v.

BETH ANN MASON,

    Appellee

: No. 69 MAP 2019
:
: Appeal from the Order of the
: Superior Court at No. 1091 MDA
: 2018 dated March 7, 2019 Affirming
: in Part and Reversing in Part the
: Order of the Franklin County Court
: of Common Pleas, Criminal
: Division, at No. CP-28-CR-0002352-
: 2017 dated June 26, 2018.
:
: ARGUED: May 19, 2020


**DISSENTING OPINION**


**JUSTICE WECHT**          **DECIDED: March 25, 2021**

As I have explained in the past,[1] this Court's Wiretap Act decisions have strayed impermissibly from the statute's unambiguous language. Unlike the Majority, I would overturn those flawed decisions today.

**I.**

The Wiretap Act contains a statutory suppression remedy that extends to non-constitutional violations. Specifically, the suppression provision forbids, among other things, the disclosure of "the contents of any . . . oral communication" in any judicial

---

[1] *See PSP v. Grove*, 161 A.3d 877, 906 (Pa. 2017) (Wecht, J., concurring) ("It never was necessary or warranted to engraft the constitutional standard for ascertaining a reasonable expectation of privacy onto this definition, and doing so both contravened the statute's plain language and limited the clear scope of the elevated protection that it sought to provide, effectively rewriting the statute to conform to a lower standard that the legislature did not choose to employ.").

proceeding.[2]  Because Pennsylvania's Wiretap Act embodies a "two-party consent" approach, the statute defines an "oral communication" as "[a]ny oral communication uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation."[3]  In other words, suppression is warranted under the Act when a speaker justifiably expects that his or her communication will not be recorded.

This statutory privacy shield, without question, was intended to provide greater protection than the Fourth Amendment to the United States Constitution.[4]  Yet for over twenty years now this Court has mistakenly applied the "reasonable expectation of privacy" test—a standard used to determine whether a "search" has occurred under the Fourth Amendment—in matters arising under the Wiretap Act.  There is no justification for this.  The reasonable expectation of privacy test stems directly from the text of the Fourth Amendment, which prohibits only "unreasonable searches and seizures."[5]  But the Wiretap Act, unlike the Fourth Amendment, does not turn on reasonable expectations of *privacy*.  It requires only what it says on its face: a justifiable expectation *of non-interception.*

The regrettable fusion of these two distinct standards can be traced to *Agnew v. Dupler*, 717 A.2d 519 (Pa. 1998), where the Court held that:

---

[2]      18 Pa.C.S. § 5721.1(a)(1).

[3]      18 Pa.C.S. § 5702.

[4]      *See Commonwealth v. Spangler*, 809 A.2d 234, 237 (Pa. 2002) (citing Michael S. Lieb, *E–Mail & the Wiretap Laws: Why Congress Should Add Electronic Communication to Title III's Statutory Exclusionary Rule and Expressly Reject a "Good Faith" Exception*, 34 HARV. J. ON LEGIS. 393, 422 (1997) for the proposition that state wiretap acts "provide greater protection than the Fourth Amendment").

[5]      U.S. CONST. amend. IV (emphasis added).

In determining whether the expectation of non-interception was justified under the circumstances of a particular case, it is necessary for a reviewing court to examine the expectation in accordance with the principles surrounding the right to privacy, *for one cannot have an expectation of non-interception absent a finding of a reasonable expectation of privacy.* To determine the existence of an expectation of privacy in one's activities, a reviewing court must first examine whether the person exhibited [a subjective] expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable.

*Id.* at 523 (emphasis added).

The Third Circuit has observed that *Agnew* marks a turning point in our Wiretap Act jurisprudence given that the decision "squelched the distinction developing in some lower court cases between a reasonable expectation of non-interception and an expectation of privacy."[6] Truth be told, the Third Circuit is being charitable. The *Agnew* court did not merely overrule a few lower court decisions. The Court disregarded the plain language of the Wiretap Act and applied inapposite Fourth Amendment concepts because it believed, incorrectly, that anyone who lacks a generalized expectation of privacy (à la *Katz*[7]) necessarily should assume that their conversation is being recorded. But, as the Superior Court has explained, many situations could arise in which an individual possesses one expectation but not the other.

[I]f one is being examined by his or her physician and knows from past experience that the doctor often carries a small tape recorder in a pocket to record patient interviews, one's expectation of non-interception is nearly non-existent, but the expectation of privacy is still extremely high. On the other hand, if one is speaking with the town gossip at a public swimming pool under circumstances insuring that the gossip is not wearing a body

---

[6]     *Kelly v. Borough of Carlisle*, 622 F.3d 248, 257 (3d Cir. 2010).

[7]     *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) (setting forth the now familiar two-part test, which requires that the defendant possess "an actual (subjective) expectation of privacy . . . that society is prepared to recognize as 'reasonable'"); *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (adopting Justice Harlan's two-part formula).

wire, one's expectation of non-interception is very high, but the expectation of privacy is very low.[8]

There are some who believe that *Agnew*'s holding, though clearly wrong as a matter of statutory interpretation, is unlikely to make a difference in most cases. That is so, the argument goes, because a person who has a reasonable expectation of privacy under the Fourth Amendment will almost always justifiably expect that their words are not being recorded and vice versa. As the Superior Court's decision below illustrates, however, courts applying the reasonable expectation of privacy test often focus on whether a person has a generalized expectation of privacy *in a particular place*.[9] But an analysis that hinges on such "constitutionally protected areas" makes no sense when the only question is whether a justified expectation of non-interception exists.

For example, the United States Supreme Court has held that no one has a reasonable expectation of privacy in the area beyond a home's curtilage (so-called "open fields").[10] But the rationale for that holding—a belief that such areas "usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be"[11]—translates poorly in the Wiretap Act context. Would a

---

[8] *Commonwealth v. McIvor*, 670 A.2d 697, 700 (Pa. Super. 1996); *see also Agnew*, 717 A.2d at 525 (Nigro, J., concurring) ("[T]he expectation of non-interception and the expectation of privacy involve two distinct inquiries.").

[9] *Commonwealth v. Mason*, 2019 WL 1084210, at *4 (Pa. Super. 2019) (citing cases for the proposition that "employees have a reasonable expectation of privacy in certain areas of their workplace"); *see also* Brief for Commonwealth at 17 ("[T]his Honorable Court should not be ready to recognize that anyone, other than a parent, has a privacy interest in the sleeping area of a child.").

[10] *Oliver v. United States*, 466 U.S. 170, 178 (1984) ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home.").

[11] *Id.* at 179.

reasonable person assume that he is being recorded whenever he converses in an open field? I doubt it.

In fact, faithful application of the Fourth Amendment's reasonable expectation of privacy test would eviscerate the Wiretap Act in almost all circumstances because the law is clear that speakers generally lack a constitutional expectation of privacy in their oral communications. In this regard, the United States Supreme Court has held that a speaker loses any expectation of privacy in his words at the moment he utters them in the presence of another.[12] This means that applying *Agnew*'s literal holding would lead to few if any conversations being protected by the Wiretap Act—a state of affairs which the General Assembly surely did not intend.

The time has come for this Court to repudiate *Agnew*'s atextual holding. When our precedent conflicts with the plain language of a duly enacted statute, there are only two reasonable approaches. We can either adhere to *stare decisis* and continue to apply the flawed decision or we can instead choose to overturn it. Today's Majority, apparently unsatisfied with both of these options, neither overturns nor applies *Agnew*. Instead, the Majority treats as precedential *Agnew*'s reasonable expectation of privacy test, only to disregard that test a mere eight pages later.[13] The Majority cannot have it both ways.

---

[12] *Smith*, 442 U.S. at 743-44 ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."); *Hoffa v. United States*, 385 U.S. 293, 302 (1966) ("Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."); *accord Lopez v. United States*, 373 U.S. 427, 465 (1963) (Brennan, J., dissenting) ("The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.").

[13] *Compare* Majority Opinion at 10 n.9 (quoting *Agnew* for the proposition that "one cannot have an expectation of non-interception absent a finding of a reasonable expectation of privacy"), *with id.* at 18 (holding that "persons in Appellee's position do not

Reciting one test and applying another is not "judicial restraint."[14]  It is instead a recipe for rampant confusion.  And while I applaud the Majority for taking baby steps towards discarding the reasonable expectation of privacy standard, today's decision is sure to puzzle lawyers and judges about whether *Agnew* remains good law moving forward.

Put simply, a reasonable expectation of privacy is not a necessary element under the Wiretap Act.  As I have opined previously, *Agnew* "reflects an erroneous conflation of statutory and constitutional standards, and unduly restricts the scope of the interest that the Wiretap Act is intended to protect."[15]  *Agnew* must be overruled explicitly.  I would do so today.

**II.**

In his concurring opinion, my learned colleague Justice Dougherty attempts to frame my disagreement with the Majority as a dispute about the role of precedent.  While I am more than happy, as always, to discuss and debate my views on *stare decisis*—an imprecise doctrine about which many jurists disagree—Justice Dougherty seems to be missing the point.  What separates my method from the Majority's is not a different conception about how willing courts should be to repudiate past erroneous decisions.  Rather, what makes the Majority's position so indefensible is that it neither overturns nor applies the rule announced in *Agnew.*  This ignore-without-overruling approach can be called many things, but respectful of *stare decisis* it is not.  Justice Dougherty's valentine to settled precedent might be more persuasive if he hadn't delivered it while simultaneously joining an opinion that dodges binding precedent.

---

have a justifiable expectation that their oral communications will not be *subject to interception* while they are in a child's bedroom (emphasis added)).

[14]     Majority Opinion at 10 n.9.

[15]     *Grove*, 161 A.3d at 902 (Wecht, J., concurring).

Nevertheless, given the risk that some readers might mistake Justice Dougherty's personal conception of *stare decisis* for the only legitimate view on the matter, I feel compelled to respond with a few points that have been omitted from the Concurrence. To begin with, *stare decisis* (meaning "to stand by things decided"[16]) is not an absolute rule. As the mountain of decisions overturned by courts every year would suggest, *stare decisis* "is not an inexorable command to be followed blindly when such adherence leads to perpetuating error."[17] Thus, when our prior decisions have "distorted the clear intention of the legislative enactment and by that erroneous interpretation permitted the policy of that legislation to be effectively frustrated," this Court has "no alternative but to rectify our earlier pronouncements and may not blindly adhere to the past rulings out of a deference to antiquity."[18]

Furthermore, neither the Majority nor the Concurrence argue that *Agnew* was correctly decided, and *stare decisis* "isn't supposed to be the art of methodically ignoring what everyone knows to be true."[19] As I explained in the previous section, the *Agnew*

---

[16]     *Stare Decisis*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Super Stare Decisis*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The theory that courts must follow earlier court decisions without considering whether those decisions were correct. Critics argue that strict adherence to old decisions can result in grave injustices and cite as an example the repudiation of *Plessy v. Ferguson*, 163 U.S. 537 (1896) by *Brown v. Board of Education*, 347 U.S. 483 (1954).").

[17]     *Commonwealth v. Small*, 238 A.3d 1267, 1285 (Pa. 2020) (quoting *Stilp v. Commonwealth*, 905 A.2d 918, 967 (Pa. 2006)). To be fair, Justice Dougherty evidently subscribes to the view that not all precedents are created equal. *See* Concurring Opinion at 5 n.2 (Dougherty, J.). But I must confess, I am unfamiliar with the apparent principle that the Court's decisions are less authoritative when they were "decided just months ago." *Id.*

[18]     *Id.* (quoting *Mayhugh v. Coon*, 331 A.2d 452, 456 (Pa. 1975)).

[19]     *Ramos v. Louisiana*, ___ U.S. ___, 140 S.Ct. 1390, 1405 (2020) (citing R. CROSS & J. HARRIS, PRECEDENT IN ENGLISH LAW 1 (4th ed. 1991) (attributing this aphorism to Jeremy Bentham)).

Court plainly erred by departing from the text of the Wiretap Act and imposing instead an unworkable judge-made rule which bears no resemblance to the statutory text that allegedly justified it. And while Justice Dougherty might prefer to leave bad enough alone, I personally have never been of the view that "we must consecrate the mere blunders of those who went before us, and stumble every time we come to the place where they have stumbled."[20]

In advocating for everlasting adherence to *Agnew*'s unsound holding, Justice Dougherty underscores that the legislature has amended Section 5702 of the Wiretap Act four times post-*Agnew*.[21] This is a potentially significant fact because courts *may* presume that, when this Court interprets "certain statutory language and that language is retained in subsequent amendments to the same statute, the legislature approved of and intended to uphold that interpretation."[22] But that presumption is just one of many that exist to help courts ascertain the intent of the General Assembly in difficult cases. The default rule—indeed, the most important rule when it comes to statutory interpretation—is that the best indication of the General Assembly's intent is the plain language of the statute.[23]

In any event, the view that legislative inaction signifies tacit approval of even our most flawed decisions is not one that I share. It is well-settled that the burden of correcting

---

[20] *McDowell v. Oyer*, 21 Pa. 417, 423 (Pa. 1853) ("A palpable mistake, violating justice, reason, and law, must be corrected, no matter by whom it may have been made. There are cases in our books which bear such marks of haste and inattention, that they demand reconsideration.").

[21] Concurring Opinion at 4 (Dougherty, J.).

[22] *PSP v. Jet-Set Rest., LLC*, 191 A.3d 817, 823 (Pa. 2018).

[23] *See* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

our own errors does not rest entirely on the shoulders of the General Assembly.[24] And given the many possible explanations for legislative inaction, we "walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle."[25] Thus, the presumption that Justice Dougherty embraces should control only when there are legitimate reasons to assume that the General Assembly's inaction holds interpretive significance.

This approach is entirely consistent with the Statutory Construction Act, which could not be clearer that our primary goal when interpreting statutes must be to ascertain the intent of the General Assembly.[26] It also tells us, in no uncertain terms, that the best indication of the General Assembly's intent is the plain language of the statute.[27] In other words, no presumption or canon should ever be used to disregard otherwise unambiguous statutory text. After establishing these fundamental principles, the very next section lists five non-exclusive presumptions that "may be used"[28] to ascertain the legislature's intent—one of which is the presumption that the General Assembly intends subsequent statutes to be interpreted consistently with this Court's earlier decisions on

---

[24]  *Small*, 238 A.3d at 1285 ("[T]his Court's departure from the plain language of a statute should not be viewed categorically as placing the burden upon the General Assembly to detect our error and to marshal the resources to correct it.").

[25]  *Helvering v. Hallock*, 309 U.S. 106, 121 (1940).

[26]  1 Pa.C.S. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.").

[27]  *Id.* § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

[28]  *Id.* § 1922 ("In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, *may* be used[.]" (emphasis added)).

the same subject. We should not invoke these explicitly non-mandatory presumptions as holy writ.

Any attempt to treat as gospel a non-exclusive list of non-mandatory presumptions (which, in any event, cannot be used to negate a statute's plain language) cannot be taken seriously. The Section 1922 presumptions are optional, though potentially useful, tools for ascertaining legislative intent in the event of ambiguity.[29] When the General Assembly instructs judges that they "may" do something, that necessarily suggests that they also may not. Indeed, in some cases, more than one of the listed presumptions will apply; yet those presumptions will weigh in favor of divergent conclusions, making it impossible to apply all of them.

To understand the weakness of Justice Dougherty's claim that Section 1922(4) circumscribes our judicial discretion here, consider one of the other listed presumptions, which states that the General Assembly does not intend to pass unconstitutional statutes.[30] Taken to its logical conclusion, Justice Dougherty's understanding of the Statutory Construction Act would prevent courts from ever striking down statutes on constitutional grounds. When faced with a plainly unconstitutional enactment, we would instead be forced to dream up an interpretation (no matter how strained) that passes constitutional muster. Of course, that is not what the legislature intended, which is why the presumptions are both discretionary and subservient to the principle that a statute's plain language is the best indication of legislative intent.[31]

---

[29]     *Id.*; *accord Small*, 238 A.3d at 1285 ("Although the Commonwealth's point is well-taken, we do not view the asserted presumption to be controlling. Application of this presumption is discretionary, not mandatory.").

[30]     1 Pa.C.S. § 1922(3) (courts may presume that "the General Assembly does not intend to violate the Constitution of the United States or of this Commonwealth").

[31]     Notably, other presumptions in Section 1922—in particular the presumption that the legislature does not intend "absurd" or "unreasonable" results—are intentionally

Put simply, the Section 1922(4) presumption should be afforded controlling weight only when there are legitimate reasons to assume that the General Assembly's inaction holds interpretive significance. Here, there are many reasons to suspect otherwise. For one thing, while Justice Dougherty focuses on the number of amendments to Section 5702 after *Agnew*,[32] he fails to mention that Section 5702 is a definitional provision containing more than thirty terms that have nothing to do with the issue that we addressed in *Agnew.* For example, one of the four post-*Agnew* amendments that Justice Dougherty highlights simply added the term "suspected criminal activity" to Section 5702's list of defined terms.[33] But the insertion of that definition is irrelevant to the question we addressed in *Agnew*, which concerned only whether a particular communication constituted an "oral communication" under the Act.[34]

Indeed, only one of the four amendments that Justice Dougherty touts (Act 22 of 2017) modified the Wiretap Act's definition of an "oral communication." Justice Dougherty emphasizes that this piece of legislation was passed "shortly" after our Court decided *Grove*, a case in which I authored a concurring opinion pointing out that the *Agnew* Court

---

vague and open to interpretation by judges. 1 Pa.C.S. § 1922(1) (courts may presume that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable").

[32] Concurring Opinion at 4 (Dougherty, J.) ("[I]n the twenty-two-year span since we decided *Agnew*, the legislature has amended Section 5702 of the Wiretap Act **four times**, and yet it has never once seen fit to statutorily alter *Agnew*'s interpretation of the term "oral communication." (emphasis in original)).

[33] *See* 2002, Dec. 9, P.L. 1350, No. 162, § 3.

[34] The 2020 amendment that Justice Dougherty mentions, *see* Concurring Opinion at 6 (Dougherty, J.), is similarly irrelevant. That legislation merely added a new criminal offense to the Wiretap Act's "crime of violence" definition. *See* 2020, Jun. 5, P.L. 246, No. 32, § 2.

almost certainly misinterpreted Section 5702.[35]  In Justice Dougherty's view, this timing strongly suggests that the General Assembly agrees with the *Agnew* and *Grove* majorities' interpretations of what constitutes an "oral communication."[36]

The wild guess underlying Justice Dougherty's argument—that legislative inaction signals the General Assembly's agreement with our holding in *Agnew*—becomes increasingly dubious the closer one looks.  Consider first the timing of Act 22.  When Justice Dougherty says that the legislature amended Section 5702 "shortly after we issued our decision in *Grove*," he is not kidding.[37]  We decided *Grove* on June 20, 2017, while the Senate and House passed Act 22 on June 27, 2017 and June 28, 2017, respectively.  Needless to say, any legislative response to our debate in *Grove* would not have materialized in Act 22 given that introducing and passing legislation is rarely a one-week affair.  In fact, the bill that ultimately became Act 22 was introduced in the Senate approximately three months earlier, in late March 2017.  And that bill was itself largely a reintroduction of a measure that had passed in the Senate during the 2015-2016 session before stalling in the House.[38]

Consider also what Act 22 actually accomplished.  Justice Dougherty's portrayal of Act 22 as some sort of back-to-basics reconsideration of the Wiretap Act's "oral communication" definition is incorrect.  The law had one main purpose:  to authorize the use of police body-cameras.  To accomplish this, one small part of Act 22 modified

---

[35]     Concurring Opinion at 4 (Dougherty, J.); *see Grove*, 161 A.3d at 906 (Wecht, J., concurring).

[36]     Concurring Opinion at 4 (Dougherty, J.) ("The legislature's decision in this regard might strongly suggest it actually found *Agnew*'s interpretation of Section 5702 to be consistent with legislative intent.").

[37]     *Id.*

[38]     *See* S.B. 976, Regular Session 2015-2016.

Section 5702 to explicitly exclude from the definition of an "oral communication" any communication "made in the presence of a law enforcement officer on official duty who is in uniform or otherwise clearly identifiable as a law enforcement officer and who is using an electronic, mechanical or other device which has been approved . . . to intercept the communication in the course of law enforcement duties."[39]  Yet Justice Dougherty would have us believe that the General Assembly, by passing a law authorizing police body-cameras (amid a national push for similar legislation, no less) clearly and manifestly approved of *Agnew*'s nineteen-year-old misreading of Section 5702.[40]

To call that theory strained would be an understatement.  I would be shocked if even a single legislator who voted for Act 22 believed that he or she was engrafting the Fourth Amendment's reasonable expectation of privacy test onto the Wiretap Act's "oral communication" definition.

Finally, consider Justice Dougherty's assumption that the General Assembly absolutely would have legislatively overturned *Agnew* if it disagreed with the decision.  This too involves a great deal of speculation.  While the Wiretap Act is a far-reaching piece of legislation, our erroneous decision in *Agnew* thankfully affects only a small number of litigants, namely, those with cases involving oral (rather than wire, electronic, or stored) communications.  Before *Grove*, Pennsylvania state courts had cited *Agnew* only eleven times, with many of those decisions simply quoting *Agnew*'s recitation of the

---

[39]   18 Pa.C.S. § 5702.

[40]   Notably, this line of reasoning distorts the usual mode of statutory interpretation, in which courts attempt to ascertain the intent of a specific General Assembly, *i.e.*, the one that enacted the statute in the first place.  Justice Dougherty's approach, by contrast, attempts to divine the unlegislated desires of lawmakers who came along many years after the enactment of the Wiretap Act and simply declined to make a fuss about *Agnew.*

applicable standard of review.[41] Others mentioned *Agnew* only in passing, while at least one decision cited *Agnew* but misstated its holding.[42] In other words, the Court's blunder in *Agnew* has had few, if any, real-world consequences to date. And legislatures, by their very nature, are reactive institutions that must triage countless legislative priorities. So, while it's unsurprising that the General Assembly quickly enacted corrective legislation after our decision holding that multi-jurisdictional DUI checkpoints are illegal,[43] *Agnew*'s potential harms are far less immediate and far too hypothetical to serve as a useful comparison.

As these flaws in Justice Dougherty's analysis illustrate, courts must always avoid rote, uncritical application of interpretive doctrines, especially when doing so requires us to make dubious assumptions about the General Assembly's intent. The various tools of statutory interpretation, if applied carelessly, can negate the most important presumption of all: the principle that statutes mean what they say. *Agnew* was wrong when it was decided and, unlike Justice Dougherty, I do not believe that the mere passage of time has transformed that wrong decision into a correct one.

---

[41] *See, e.g., Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 596 (Pa. 2012) (citing *Agnew* for the standard of review applicable to the grant of a compulsory nonsuit); *Berger v. Peco Energy Co.*, 2016 WL 5266623, at *5 (Pa. Super. 2016) (same); *Branham v. Rohm & Haas Co.*, 2013 WL 5763133, at *4 (Pa. Super. 2013) (same); *Swank v. Breakneck Creek Reg'l Auth.*, 2008 WL 9398671, at *3 (Pa. Cmwlth. 2008) (same).

[42] *Commonwealth v. Kunkel*, 2013 WL 11255699, at *7 (Pa. Super. 2013) (citing *Agnew* in passing); *Commonwealth v. McNeil*, 808 A.2d 950, 957 n.8 (Pa. Super. 2002) (stating incorrectly that "[*Agnew*] held that the police officer's conversations were not oral communications within the meaning of the Wiretap Act because Agnew did not have a reasonable expectation *that the contents of the discussion would not be intercepted*." (emphasis added)).

[43] *See* Concurring Opinion at 6 n.3 (Dougherty, J.) (discussing the General Assembly's response to our decision in *Commonwealth v. Hlubin*, 208 A.3d 1032, 1052 (Pa. 2019)).

One common rationale for the doctrine of *stare decisis* is that it "contributes to the actual and perceived integrity of the judicial process."[44]  If our goal is to contribute to the integrity of the judicial process, we should abandon, rather than perpetuate, the fiction that failing to admit this Court's past errors is a noble endeavor.  Fortunately, a proper, nuanced understanding of *stare decisis* does not prevent us from reexamining *Agnew.*  When a prior decision was obviously mistaken and this Court is unwilling to defend it (or even apply it), blind obedience to *stare decisis* is unwarranted.

### III.

Turning to the specific facts before us, I disagree with the Majority's conclusion that Beth Ann Mason lacked a justified expectation that her oral communications would not be intercepted in her employer's home.  The Majority's entire analysis hinges on the correctness of a single proposition: that the use of recording devices to monitor child care workers is "ubiquitous."[45]  The implication, of course, is that nannying is an occupation in which constant surveillance is the norm, to be expected by any reasonable caregiver.  The Majority offers no support for this assertion, which strikes me as quite dubious.  My own instinct—admittedly no more scientific than the Majority's—is that most parents are reluctant to place their children (and homes) in the custody of people they do not trust.[46]

---

[44]     *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).

[45]     Majority Opinion at 19.

[46]     While I agree with the Majority that the term "nanny cam" has, to some extent, permeated our shared lexicon, I reject the notion that nanny cams are ubiquitous simply because society has a name for them.  *See* Majority Opinion at 19 ("Notably, the use of recording devices in homes as a means for parents to monitor people hired to care for their children have become so commonplace that these devices are often referred to as "nanny cams."  That is to say that the expectation that a childcare worker is going to be recorded in their employer's home is so ubiquitous in our society that we have a name for it.").  To state the obvious, not everything that has a name is ubiquitous.  Pandas?  Lamborghinis?  Xylophones?

More importantly, as explained above, the Wiretap Act's requirement of a justified expectation of non-interception under the circumstances was never intended to be a high bar. Most people in most situations generally assume (correctly) that they are not being recorded. Thus, as before, "I have no trouble concluding that this expectation [of non-interception] is justifiable in the vast majority of instances in which people speak, and becomes unjustifiable only in the presence of some indicia that one's utterances are being intercepted."[47]

Because no such indicia are present here, Mason's words constituted an "oral communication" under the Wiretap Act. Accordingly, the lower courts correctly held that the portion of audio in which Mason can be heard telling the victim to "shut up" was inadmissible. Because the Majority concludes otherwise, I respectfully dissent.

---

[47] *Grove*, 161 A.3d at 905-06 (Wecht, J., concurring).